UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| Plaintiff, | : | Criminal Action |
| | : | No. 07-086 |
| **v.** | : | |
| | : | |
| **JEFFREY VIOLA,** | : | March 30, 2007 |
| | : | 3:30 p.m. |
| | : | |
| | : | |
| Defendant. | : | Washington, D.C. |
| | : | |

............................ :

* * * * SEALED * * * *

TRANSCRIPT OF PLEA PROCEEDINGS
BEFORE THE HONORABLE RICHARD W. ROBERTS,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the United States:    **Wanda Dixon, Trial Attorney**
U.S. DEPARTMENT OF JUSTICE
Narcotic and Dangerous Drug
Section
1400 New York Avenue, NW
Washington, DC 20530

**Patrick Hearn, Trial Attorney**
U.S. DEPARTMENT OF JUSTICE
Narcotic and Dangerous Drug
Section
1400 New York Avenue, NW
Washington, DC 20530

For the Defendant:    **Jonathan Jeffress, Esq.**
FEDERAL PUBLIC DEFENDER
625 Indiana Avenue, NW
Suite 550
Washington, DC 20004
(202) 208-7500
jonathan_jeffress@fd.org

Appearances:  (Cont.)

Court Reporter:                    **Scott L. Wallace, RDR, CRR**
                                   Official Court Reporter
                                   Room 6509, U.S. Courthouse
                                   Washington, D.C. 20001
                                   202.326.0566
                                   scottlyn01@aol.com

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

<u>**MORNING SESSION, MARCH 30, 2007**</u>

(3:29 p.m.)

THE DEPUTY CLERK:  Criminal case number 07-86, the United States versus Jeffrey Viola.  For the government, Ms. Dixon; for the defendant, Mr. Jeffress.

THE COURT:  All right.  Good afternoon.  Let me just remind counsel that if we have more matters to conclude, we need to get the paperwork days in advance, not the day of.  The submission of the motion to seal on the day of doesn't work.  It really does interfere with our ability to prepare properly.  So we need that stuff in advance.

MS. DIXON:  Yes, Your Honor, we apologize to the Court.

THE COURT:  Let me ask you, Ms. Dixon, the original plea agreement that's in front of me now marked as Exhibit 3, I take it there are some changes to it from the copy that I got before?

MS. DIXON:  Yes, Your Honor.

THE COURT:  Other than the criminal number and the fact that paragraph 1 refers to a superseding indictment, are there any other changes that were made to the plea agreement?

MS. DIXON:  No, Your Honor.

THE COURT:  All right.  The change to paragraph 1 does not appear to have been entirely complete because it now reads the defendant agrees to plead guilty to Count 1 of the information in Case 05-454.

MS. DIXON:  Yes, Your Honor.

```
1          THE COURT:  Which isn't accurate anymore.

2          MS. DIXON:  No, Your Honor.

3          THE COURT:  Let me hand this back to you all.  You'll

4  probably want to adjust that.

5          MS. DIXON:  Yes, Your Honor.

6          THE COURT:  When did you leave -- off the record.

7          (Discussion had off the record.)

8          THE COURT:  Back on the record.

9          MS. DIXON:  Thank you, Your Honor.

10         THE COURT:  All right.  All right, Mr. Jeffress, I

11  understand Mr. Viola is proposing to enter a plea of guilty to

12  the superseding information; is that correct?

13         MR. JEFFRESS:  That's correct, Your Honor.

14         THE COURT:  Let me invite him to come forward, then.  And

15  would you place the defendant under oath.

16         THE DEPUTY CLERK:  Yes.

17          (JEFFREY VIOLA, DEFENDANT IN THE CASE, SWORN.)

18         THE COURT:  All right.  Good afternoon.  Let me ask you to

19  tell me how you pronounce your last name.

20         THE DEFENDANT:  Viola.

21         THE COURT:  Viola with a long I?

22         THE DEFENDANT:  Yes.

23         THE COURT:  All right, Mr. Viola, you're now under oath.

24  If you do not answer my questions truthfully, you could be

25  prosecuted for perjury or making a false statement.  Do you
```

1  understand that?

2      THE DEFENDANT:  Correct, Your Honor.

3      THE COURT:  The purpose of this hearing is for you to make

4  a decision.  You must decide whether you want to plead guilty to

5  the charge against you or whether you want to go to trial on that

6  charge.  In order for you to make such an important decision,

7  though, it's vital that you understand everything that's going on

8  and everything that I'll be explaining to you.

9      So, if you don't understand something, please let me know

10 that, and I'll try to explain it to you in a clearer fashion.

11     I'll also let you talk to your lawyer at any time about

12 what we're discussing so far.  So, will you promise to let me

13 know if there's anything you don't understand?

14     THE DEFENDANT:  Yes, I would.

15     THE COURT:  How old are you now, sir?

16     THE DEFENDANT:  I am 51.

17     THE COURT:  And can you read and write?

18     THE DEFENDANT:  Yes.

19     THE COURT:  How far did you go in school?

20     THE DEFENDANT:  Graduated high school and attended some

21 college.

22     THE COURT:  And where were you born?

23     THE DEFENDANT:  In Hackensack, New Jersey.

24     THE COURT:  Have you taken any alcohol or drugs in the

25 last 48 hours or any medicine that could affect your ability to

1   understand what you're doing by proposing to plead guilty?

2          THE DEFENDANT:  No.

3          THE COURT:  Have you ever received any treatment for any

4   type of mental illness or emotional disturbance or for addiction

5   to narcotic drugs of any kind?

6          THE DEFENDANT:  For addiction to drugs, I have previously,

7   yes.

8          THE COURT:  And how long ago was that?

9          THE DEFENDANT:  I would say from 15 years ago to the

10  present.

11         THE COURT:  All right.  And are you receiving treatment

12  now?

13         THE DEFENDANT:  Yes.

14         THE COURT:  And are you, in connection with the treatment

15  you're receiving now, are you taking any medicine?

16         THE DEFENDANT:  Yes, I am.

17         THE COURT:  All right.  What kind of medicine are you

18  taking?

19         THE DEFENDANT:  I'm on a methadone maintenance program.

20         THE COURT:  All right.  When is the last time you took

21  some methadone?

22         THE DEFENDANT:  It would be this morning.

23         THE COURT:  Has it had any impact on your ability to see

24  or hear or understand what's happening?

25         THE DEFENDANT:  No, Your Honor, none whatsoever.

1          THE COURT:  Are you feeling well enough to proceed with

2     these proceedings?

3          THE DEFENDANT:  Yes.

4          THE COURT:  All right.  Does either counsel know of any

5     reason why the current maintenance medicine may have or may be

6     impairing Mr. Viola's ability to proceed and understand today?

7          MR. JEFFRESS:  No, Your Honor.  No, Your Honor.

8          THE COURT:  All right.  Ms. Romero, let's arraign

9     Mr. Viola on the superseding information.

10         THE DEPUTY CLERK:  Yes, Your Honor.  Are you Jeffrey

11    Viola?

12         THE DEFENDANT:  Yes, I am.

13         THE DEPUTY CLERK:  Your Honor, may the record reflect my

14    handing the defendant and his counsel through his counsel copies

15    of the information which has been filed in this case.

16         Mr. Viola, you're charged under criminal case number

17    07-086 in a one-count criminal information with conspiracy to

18    manufacture and distribute ten grams or more of lysergic acid

19    diethylamide intending and knowing that the LSD would be

20    unlawfully imported into the United States.

21         THE COURT:  All right.  Do you waive formal reading?

22         MR. JEFFRESS:  On behalf of Mr. Viola, he does waive

23    formal reading.  Thank you.

24         THE COURT:  Mr. Viola, have you now received a copy of the

25    information pending against you containing the written charge in

1    this case?

2         THE DEFENDANT:  Yes, I have, Your Honor.

3         THE COURT:  Have you read this information?

4         THE DEFENDANT:  I read this information and it's the same

5    as what I previously read.

6         THE COURT:  All right.  And do you understand the charge?

7         THE DEFENDANT:  Yes.

8         THE COURT:  Have you fully discussed the charge and this

9    case in general with your lawyer?

10        THE DEFENDANT:  Yes.

11        THE COURT:  Are you fully satisfied with the services of

12   your lawyer in this case?

13        THE DEFENDANT:  Absolutely, yes.

14        THE COURT:  Have you had enough time to talk with him

15   about this case?

16        THE DEFENDANT:  Yes.

17        THE COURT:  Have you had enough time to talk with him

18   about the government's plea offer and whether or not you should

19   accept it?

20        THE DEFENDANT:  Yes, we spoke at length today.

21        THE COURT:  All right.  All right.  You're charge in a

22   one-count information with violating Title 21 of the U.S. Code

23   Section 963, 959 and 960.  You're charged with conspiracy to

24   manufacture and distribute ten grams or more of lysergic acid

25   diethylamide, LSD, knowing and intending that the LSD would be

1   unlawfully imported into the United States.

2        The information alleges that roughly between March of 2004

3   and August of 2005 in Saint Maarten, the Netherlands Antilles,

4   and elsewhere, you knowingly and intentionally conspired with at

5   least one other person to knowingly and intentionally manufacture

6   and distribute ten grams or more of a mixture and substance

7   containing a detectible amount of LSD, a schedule one controlled

8   substance, intending and knowing that the substance would be

9   unlawfully imported into the United States from Saint Maarten,

10  the Netherlands Antilles, and from elsewhere outside of the

11  United States.

12       Now, Mr. Viola, if the government were to take you to

13  trial on that charge, they would be required to prove each and

14  every essential element of that charge beyond a reasonable doubt.

15  That would include proof, first, that two or more persons came to

16  a mutual understanding to try to accomplish a common and unlawful

17  plan to manufacture and distribute lysergic acid diethylamide,

18  LSD, intending or knowing that it would be unlawfully imported

19  into the United States; second, that you, knowing the unlawful

20  purpose of the plan, you willfully joined in it; and third, that

21  the amount of the LSD was ten grams or more.

22       Mr. Viola, I'm going to ask the prosecutor to tell you

23  and tell me what happened in this case, and I want you to listen

24  very carefully to what she says.  When she is finished, I'm going

25  to ask if everything that she has said is true and accurate.  If

1    there's anything that she says that's not true or accurate, I'll

2    want to you to tell me after she's finished.  So, will you

3    promise to listen carefully to everything that she says and to

4    tell me of any inaccuracies you hear?

5          THE DEFENDANT:  Yes, I will, Your Honor.

6          THE COURT:  You may be seated.  Ms. Dixon, what will the

7    government's case show if the case went to trial?

8          MS. DIXON:  Thank you, Your Honor.  If this case went to

9    trial, the government would show that beginning on or about March

10   2004 and continuing until on or about August 29th of 2005 in

11   Saint Maarten, Netherlands Antilles, and elsewhere, the

12   defendants, Donald Dean Shackelford, also known at Scott Nevel,

13   and Jeffrey Viola, also known as Jeffrey Hutchinson, and Ryan

14   Eaton, knowingly and intentionally combined, conspired and agreed

15   with each other and with others, known and unknown to the

16   government, to manufacture and distribute ten grams or more of a

17   mixture and substance containing a detectible amount of lysergic

18   acid diethylamide, also known as LSD, which is a Schedule I

19   controlled substance, intending and knowing that it would be

20   unlawfully imported into the United States from Saint Maarten,

21   the Dutch portion of an island in the Caribbean Sea that, along

22   with several other islands, is collectively known as the

23   Netherlands Antilles, and from elsewhere outside of the United

24   States.

25         Your Honor, on August the 29th of 2005, the Dutch law

1    enforcement agents on the island of Saint Maarten conducted

2    surveillance of two American targets, Mr. Shackelford and the

3    defendant today, Mr. Viola, who had been utilizing mail courier

4    services to purchase precursor chemicals used in the manufacture

5    of lysergic acid diethylamide, also known as LSD.

6         The Dutch authorities arrested Mr. Shackelford and

7    Defendant Viola on August 29th of 2005 after the two picked up a

8    package containing 250 grams of ergocristine, which is an LSD

9    precursor, from a DHL Courier Service facility on Saint Maarten.

10        Your Honor, following the arrest, the Dutch authorities

11   obtained a search warrant for the residence where Mr. Shackelford

12   and Mr. Viola were staying on Saint Maarten.  On the residence,

13   the Dutch police discovered a laboratory believed to be used to

14   manufacture LSD.

15        THE COURT:  I'm sorry to interrupt you.  May I ask you to

16   read the footnotes as well just because it's part of what's been

17   signed.

18        MS. DIXON:  Yes, Your Honor.  Thank you.

19        THE COURT:  Okay.

20        MS. DIXON:  Your Honor, with regard to -- well, I haven't

21   gotten to the place where the first -- well, actually, strike

22   that.  Yes, if the Court would indulge me briefly.

23        THE COURT:  All right.

24        MS. DIXON:  Yes, Your Honor.  Thank you.  Basically, the

25   amount of ergocristine that I just referenced, which is 250

1  grams, is sufficient to manufacture an estimated 132.6 grams of

2  LSD, and that is equivalent to approximately 330,000 doses of

3  LSD.

4      Your Honor, the Dutch authorities on Saint Maarten

5  contacted their headquarters in Holland which immediately

6  dispatched a hazardous -- strike that -- a hazardous materials or

7  HAZMAT team to investigate the Saint Maarten residence.

8      On August 30th of 2005, the Dutch HAZMAT team entered and

9  searched the defendant's residence where they found laboratory

10  equipment, several unused sheets of blotter paper, which is used

11  to deliver individual doses of LSD for ingestion, and one partial

12  sheet of blotter paper that tested positive for the presence of

13  LSD.

14      Your Honor, a full sheet of blotter paper is typically

15  soaked in a solution containing the LSD, is then allowed to dry,

16  and then torn off into thumbnail sized squares for delivery of

17  the individual doses by oral ingestion.

18      Your Honor, the Dutch HAZMAT team also found instructional

19  materials on the topic of manufacturing LSD, as well as

20  Shackelford's handwritten diary explaining how to manufacture

21  LSD.

22      The Dutch authorities contacted the United States Drug

23  Enforcement Administration herein after known as the D.E.A., who

24  began assisting in the investigation on Saint Maarten.

25      Your Honor, there's also relevant conduct in this case,

1   and that is that, according to PayPal records obtained by D.E.A.

2   agents, between 2002 and 2005 Mr. Viola has purchased chemical

3   equipment from various sources, including round bottom flasks,

4   rotary evaporators, condensing columns and beakers, a stirring

5   bowl, solvents, and sassafras oil.  Mr. Viola purchased the

6   sassafras oil in June and August of 2002 in two 32-ounce

7   containers.  These items, which were purchased via computer over

8   the Internet, were shipped to Viola's residence in Jackson, New

9   Jersey.

10          Your Honor, sassafras oil is used in the manufacturing

11  process of MDMA, commonly known as Ecstasy, which is also an

12  elicit chemical, elicit drug.

13          Your Honor, between December of 2004 and February of 2005,

14  Jeffrey Viola purchased blotter paper on three occasions from

15  www.blotterart.com over the Internet.  Mr. Viola had the blotter

16  paper shipped to his residence in Jackson, New Jersey.

17          On January 13th of 2006, at approximately 12:10 p.m., a

18  search warrant was executed at the residence of Jeffrey Viola at

19  784 Elton Road in Jackson, New Jersey.  D.E.A. agents recovered

20  chemicals and equipment used in the manufacturing process of LSD.

21  The search warrant was issued by a magistrate judge Tonianne,

22  T-O-N-I-A-N-N-I, Bongiovanni, B-O-N-G-I-O-V-A-N-N, in the

23  District of New Jersey on January 13th of 2006 at approximately

24  11:00 a.m.

25          Among the items recovered from inside Mr. Viola's

1  residence were typewritten notes on several different methods

2  used to manufacture LSD, and a book entitled *LSD:  My Problem*

3  *Child*.

4        D.E.A. agents also recovered chemicals and chemical

5  equipment from a storage shed in the rear of the property, as

6  well as additional chemicals which were recovered from the crawl

7  space underneath the residence.

8        One of the chemicals recovered was a clear liquid which

9  was determined to be diethylamide.  After test by the D.E.A. lab

10  by Chemist Jennifer Chu, C-H-U, Diethylamine, which is spelled

11  D-I-E-T-H-Y-L-A-M-I-N-E, which is a precursor chemical used in

12  the process of manufacturing LSD.

13        According to D.E.A. forensic chemists familiar with the

14  manufacturing process for lysergic acid diethylamide -- and I

15  apologize, Mr. Court reporter.  That is lysergic,

16  L-Y-S-E-R-G-I-C, acid, A-C-I-D, and diethylamide,

17  D-I-E-T-H-Y-L-A-M-I-D-E.

18        Other substances found, including hydrochloric acid, can

19  also be used in the process of manufacturing LSD.

20        The chemical equipment found included six triple neck

21  flasks.  Triple neck flasks are often used in manufacturing

22  controlled substances, including LSD.  Other chemical equipment

23  present inside the shed included a ventilation hood, beakers,

24  graduated cylinders, condenser columns, separator funnels, and

25  vacuum flasks.  Many of these items were often used to

1    manufacture controlled substances, including LSD.

2         Evidence obtained during the course of the investigation

3    also showed that Mr. Viola attempted to order one kilogram of

4    1,1' carbonyldiimidazole, C-A-R-B-O-N-Y-L-D-I-I-M-I-D-A-Z-O-L-E,

5    also known as CDI, on November 12th of 2004 over the Internet

6    from a computer inside his residence in Jackson, New Jersey.  CDI

7    is a reagent used in the synthesis of LSD.

8         Thank you.

9         THE COURT:  All right.  Thank you.

10        MS. DIXON:  All these things the government would prove

11   beyond a reasonable doubt.

12        THE COURT:  Thank you.  Mr. Viola and Mr. Jeffress, would

13   you come back up?

14        All right, Mr. Viola, is what the prosecutor has just said

15   a true and accurate description of what you did and what happened

16   in this case?

17        THE DEFENDANT:  Yes.

18        THE COURT:  Is it true that you and Mr. Shackelford and

19   possibly others agreed to attempt to manufacture LSD?

20        THE DEFENDANT:  Yes, Your Honor.

21        THE COURT:  And did you, as a part of that agreement,

22   intend that that manufactured LSD would be unlawfully imported

23   into the United States?

24        THE DEFENDANT:  Yes, Your Honor.

25        THE COURT:  Did you know that doing so was unlawful and

1    illegal?

2        THE DEFENDANT:  Yes.

3        THE COURT:  And did you intend or know that the amount of

4    LSD to be manufactured would be ten grams or more?

5        THE DEFENDANT:  Yes, Your Honor.

6        THE COURT:  All right.  Mr. Viola, I want to explain

7    certain rights that you have in this matter, and I want to find

8    out whether you understand these rights.  So please listen

9    carefully to what I tell you and to the questions that I ask you,

10   and be sure to let me know if there's anything that you don't

11   understand.  Will you promise to do that?

12       THE DEFENDANT:  Yes, Your Honor.

13       THE COURT:  The charge against you is a felony charge.  Do

14   you understand that?

15       THE DEFENDANT:  Yes, I do.

16       THE COURT:  The prosecutor filed the felony charge against

17   you, but you have a Constitutional right to have the members of a

18   grand jury be the ones to charge you with a felony instead of

19   just the prosecutor doing it.

20       A grand jury is composed of at least 16 and not more than

21   23 citizens of the District of Columbia.  In order to charge you,

22   at least 12 grand jurors must find that there's probable cause to

23   believe that a crime was committed and that you committed it.

24       If they charged you, they would list the charge in a

25   document called an indictment.

1       If you do not agree to let the prosecutor's charge stand,

2   then the charge will be invalid, but the prosecutor could then

3   present the case to the grand jurors and ask them to charge you.

4       A grand jury might or might not charge you.  If you do

5   give up your right, though, to be charged by a grand jury in an

6   indictment, this case will proceed against you on the

7   prosecutor's charge just as though you had been indicted by a

8   grand jury.

9       Do you understand your right to be charged by a grand jury

10  in an indictment?

11      THE DEFENDANT:  Yes, I do, Your Honor.

12      THE COURT:  Have you discussed giving up your right to be

13  charge by the grand jury with your lawyer?

14      THE DEFENDANT:  Yes, I have.

15      THE COURT:  Do you want to give up your right to an

16  indictment by a grand jury?

17      THE DEFENDANT:  In the interest of justice, yes, I do.

18      THE COURT:  Have any threats or promises, other than

19  promises made in the plea agreement, been made to get you to give

20  up your right to be charged by a grand jury in an indictment?

21      THE DEFENDANT:  No, no one has threatened me whatsoever.

22      THE COURT:  I have what's before me marked as Court's

23  Exhibit 1, a waiver of indictment, purporting to bear your

24  signature.  I'm going to hold up this exhibit in front you now.

25  Can you see it?

1      THE DEFENDANT:  Yes, I can.

2      THE COURT:  I'm pointing to a signature near the bottom of

3 the page above the line marked defendant.  Do you see that

4 signature?

5      THE DEFENDANT:  Yes, I do.

6      THE COURT:  Is that your signature?

7      THE DEFENDANT:  That's my signature.

8      THE COURT:  Did you sign your name to this waiver of

9 indictment?

10      THE DEFENDANT:  Yes, I did.

11      THE COURT:  When you signed this, did you understand that

12 you were giving up your right to an indictment by a grand jury?

13      THE DEFENDANT:  Yes.

14      THE COURT:  And did you mean to give up that right when

15 you signed this waiver?

16      THE DEFENDANT:  Yes, I did, Your Honor.

17      THE COURT:  Had you discussed giving up that right with

18 your lawyer before you signed this waiver?

19      THE DEFENDANT:  Yes, we did.  I discussed it with him.

20      THE COURT:  All right.  Does either counsel know of any

21 reason why Mr. Viola should not waive his right to indictment?

22      MR. JEFFRESS:  No, Your Honor.

23      MS. DIXON:  No, Your Honor.

24      THE COURT:  All right.  I find that the waiver is

25 knowingly and voluntarily made, and I'll accept it.

1     Mr. Viola, you have a right to be represented by a lawyer

2   at every stage of this case.  Do you understand that?

3     THE DEFENDANT:  Yes.

4     THE COURT:  You have a right to plead not guilty to the

5   charge against you.  Do you understand that?

6     THE DEFENDANT:  Yes, I do.

7     THE COURT:  You would have a right to file motions making

8   legal challenges to the government's case against you.  For

9   example, you could seek to have the charges dismissed or have

10  evidence against you suppressed or thrown out.  Do you understand

11  that?

12    THE DEFENDANT:  Yes, I do.

13    THE COURT:  You have a right to have a jury trial in this

14  case.  That means that 12 citizens of the District of Columbia

15  would sit in a courtroom and determine whether you are guilty or

16  not guilty based upon evidence presented in a courtroom.  Do you

17  understand your right to a jury trial?

18    THE DEFENDANT:  Yes, I do, Your Honor.

19    THE COURT:  If you choose to go to trial, you would have a

20  right to be represented by your lawyer at that trial.  Do you

21  understand that?

22    THE DEFENDANT:  Yes.

23    THE COURT:  At a trial, you would have the right, through

24  your lawyer, to confront and cross-examine any witnesses who

25  testify against you.  Do you understand that?

1          THE DEFENDANT:  Yes.

2          THE COURT:  You would also have the right to present your

3     own witnesses, and you would have the right to subpoena them, to

4     require them to testify in your defense.  Do you understand that?

5          THE DEFENDANT:  Yes, I do, Your Honor.

6          THE COURT:  At a trial you would have the right to testify

7     and to present evidence on your behalf if you wanted to; however,

8     you would not be required to testify or to present any evidence

9     if you did not want to.  That's because you cannot be forced to

10    incriminate yourself.  That means you cannot be forced to present

11    evidence of your own guilt.  Do you understand that?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  If you chose not to testify at a trial or to

14    put on any evidence at a trial, those choices could not be used

15    against you at that trial.  Do you understand that?

16         THE DEFENDANT:  Yes.

17         THE COURT:  At a trial, you would be presumed by the law

18    to be innocent, just as you are now.  That's because it's the

19    government's burden to prove your guilt beyond a reasonable

20    doubt, and until it does that, you cannot be convicted at any

21    trial.  Do you understand that?

22         THE DEFENDANT:  Yes, Your Honor.

23         THE COURT:  If you went to trial and you were convicted,

24    you would have the right to appeal your conviction to the Court

25    of Appeals and to have a lawyer help you prepare your appeal.  Do

1    you understand that?

2         THE DEFENDANT:  Yes.

3         THE COURT:  Do you know what I mean by your right to

4    appeal?

5         THE DEFENDANT:  Yes, Your Honor, to call into question

6    what came out of the trial.

7         THE COURT:  Say that again.

8         THE DEFENDANT:  To call into question what came out of the

9    trial.

10        THE COURT:  All right.  And to have a higher judicial

11   tribunal review all those questions.

12        THE DEFENDANT:  Yes.

13        THE COURT:  All right.  Now, by pleading guilty, you would

14   be generally giving up your rights to appeal.  Do you understand

15   that?

16        THE DEFENDANT:  Yes.

17        THE COURT:  Now, there are exceptions.  You can appeal

18   your conviction after a guilty plea if you believe that your

19   guilty plea was somehow unlawful or involuntary or if there is

20   some other fundamental defect in these guilty plea proceedings.

21   You also have a right to appeal your sentence if the sentence is

22   illegal.  Do you understand those things?

23        THE DEFENDANT:  Yes.

24        THE COURT:  Now, if you plead guilty in this case and I

25   accept your guilty plea, you'll give up all of the rights that I

1    just explained to you, aside from the exceptions that I

2    mentioned, because there will not be any trial and there probably

3    will be no appeal.  Do you understand that?

4         THE DEFENDANT:  Yes, Your Honor.

5         THE COURT:  Do you want to give up your right to a trial

6    and all of the rights that I've explained that you would have if

7    your case went to trial?

8         THE DEFENDANT:  Yes, I do, Your Honor.

9         THE COURT:  Do you want to give up most of your rights to

10   an appeal?

11        THE DEFENDANT:  Yes, I do.

12        THE COURT:  I have before me what's marked as Exhibit 2, a

13   waiver of trial by jury, that purports to bear your signature.

14   I'm holding it up in front of you now.  Can you see this?

15        THE DEFENDANT:  Yes, I can.

16        THE COURT:  I'm pointing to a signature above the line

17   mark defendant.  Do you see that?

18        THE DEFENDANT:  Yes, I do.

19        THE COURT:  IS that your signature?

20        THE DEFENDANT:  That's my signature, Your Honor.

21        THE COURT:  Did you sign your name to this waiver of trial

22   by jury?

23        THE DEFENDANT:  Yes, I did.

24        THE COURT:  When you signed this, did you understand that

25   by signing it you were giving up your right to a jury trial?

1          THE DEFENDANT:  Yes, I did, Your Honor.

2          THE COURT:  Did you mean to give up that right when you

3    signed it?

4          THE DEFENDANT:  Yes, I did mean to give it up.

5          THE COURT:  And did you discuss with your lawyer giving up

6    that right before you signed this waiver?

7          THE DEFENDANT:  Yes, I did.

8          THE COURT:  All right.  Does either counsel know of any

9    reason why Mr. Viola should not waive his right to a jury trial?

10         MR. JEFFRESS:  No, Your Honor.

11         MS. DIXON:  No, Your Honor.

12         THE COURT:  All right.  I find that that waiver is

13   knowingly and voluntarily made and I'll accept it.

14         I have before me the plea agreement in this case as well.

15   Mr. Viola, do you have your own copy of the plea agreement?

16         THE DEFENDANT:  Yes, I do, Your Honor.

17         THE COURT:  Have you carefully read it?

18         THE DEFENDANT:  Yes, I have.  I reviewed it over the past

19   week and again today.

20         THE COURT:  All right.  And do you understand its terms?

21         THE DEFENDANT:  Yes, I do.

22         THE COURT:  Have you discussed the plea agreement with

23   your lawyer?

24         THE DEFENDANT:  Yes, I have.

25         THE COURT:  Does this plea agreement represent the entire

1    understanding that you have with the government?

2         THE DEFENDANT:  This -- yes, this represents the entire

3    understanding.

4         THE COURT:  Has anyone given you any other or different

5    assurance of any kind to get you to plead guilty in this case?

6         THE DEFENDANT:  No, Your Honor.

7         THE COURT:  Do you have any question or confusion about

8    the plea agreement at this moment?

9         THE DEFENDANT:  No, I do not.

10        THE COURT:  All right.  The plea agreement, as I have it

11   marked as Court's Exhibit 3, consists of ten pages, bears

12   original signatures on the final page, as well as some initials

13   on the front page.

14        Mr. Viola, I'm going hold up in front of you now the plea

15   agreement, and I'm going turn to the back page.  Can you see

16   that?  Do you see that back page?

17        THE DEFENDANT:  Yes, Your Honor.

18        THE COURT:  There is a signature above a line marked

19   "Jeffrey Viola" on that page.  Do you see that?

20        THE DEFENDANT:  Yes, Your Honor.

21        THE COURT:  Is that your signature?

22        THE DEFENDANT:  That's my signature, Your Honor.

23        THE COURT:  Did you sign your name to this agreement?

24        THE DEFENDANT:  Yes, I did.

25        THE COURT:  And did you do that only after having fully

1   read and understood and agreed with the contents of this plea

2   agreement?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  I have, along with the plea agreement, the

5   statement of facts that's marked as Court's Exhibit 4 that

6   consists of five pages with original signatures on the fifth

7   page.  I'm holding the statement of facts up in front of you now,

8   and I'm turning to the fifth page of that statement.  Can you see

9   this page?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  I'm also pointing to a signature above the

12   line marked "Jeffrey Viola" on the fifth page and holding that

13   up.  Can you see that?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  Is that your signature?

16          THE DEFENDANT:  That's my signature.

17          THE COURT:  Did you sign your name to this statement of

18   facts?

19          THE DEFENDANT:  Yes, I did.

20          THE COURT:  Did you do after only having fully read and

21   understood and agreed with the contents of this statement of

22   facts?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  All right.  As I understand it, you are

25   agreeing to plead guilty to the offense of conspiracy to

1  manufacture and distribute ten grams or more of LSD -- I might

2  have messed up the pronunciation of that third word, so I'll just

3  call it LSD -- intending and knowing that the LSD would be

4  unlawfully imported into the United States in violation of Title

5  21 of the U.S. Code, Section 963, 959 and 960.

6       Mr. Viola, if I accept your guilty plea in this case, you

7  could receive a maximum sentence of life in prison, and probation

8  would be unavailable as a sentence.

9       You would be subject to a mandatory minimum term of

10  imprisonment of ten years.  You would be subject to a term of

11  supervised release of five years.  Supervised release means that

12  if you are sent to prison, then upon your release you will be on

13  supervision under conditions and rules with which you must

14  comply.  If you violate any of those conditions, you could be

15  sent back to prison for an additional period of time.  You would

16  be subject to a maximum fine of 4 million dollars.  You would be

17  subject to a required special assessment payment of $100.  And

18  you might be required to forfeit certain property or contraband

19  to the government.

20       Mr. Viola, do you understand the maximum punishment you

21  could face if you plead guilty to this charge?

22       THE DEFENDANT:  Yes, I do, Your Honor.

23       THE COURT:  There are numerous factors, including

24  complicated guidelines, for federal judges to consider in

25  determining a sentence in a federal case.  A Sentencing

1   Guidelines Manual recommends specific sentencing ranges for

2   specific offenses.  Your criminal record, if you have one, and

3   the nature of this offense, are some of the factors that may

4   influence what your recommended sentencing guidelines range may

5   be.

6         A probation officer will conduct a presentence

7   investigation and submit a written report on those and other

8   factors to me and to the attorneys.

9         Your attorney will have to go over that report with you.

10  Both sides' attorneys will have a chance to suggest changes to

11  the report or object to portions of the report.  At the time of

12  sentencing, I'll hear from both sides' attorneys and I'll

13  determine what your recommended sentencing guideline range is.

14        Once I do that, I have to consider a sentence in that

15  recommended range, possible departures from that range, and the

16  other sentencing factors.  However, I can never sentence you to

17  more than the maximum punishment, which I explained to you a

18  little earlier.

19        Now, have you and your attorney talked about the

20  sentencing guidelines and how they might apply to your case?

21        THE DEFENDANT:  Yes, we have.

22        THE COURT:  Please tell me in your own words how much

23  prison time you think you would face under the sentencing

24  guidelines.

25        THE DEFENDANT:  It would be something less than the ten

1    years to life.

2         THE COURT:  Have you heard any reference to any range of

3    months, from a low end of that range to a high end of that range

4    in terms of numbers of months that would apply under the

5    sentencing guidelines?

6         THE DEFENDANT:  Yes, I have, Your Honor.

7         THE COURT:  What is that range you heard?

8         THE DEFENDANT:  Approximately 108 months.

9         THE COURT:  Is that the low end of the range or the high

10   end?

11        THE DEFENDANT:  At the low end of the rage.

12        THE COURT:  What would the high end of the range be, if

13   you heard it?

14        THE DEFENDANT:  To 130 months.

15        THE COURT:  All right.  Counsel, do you want to supplement

16   that?

17        MR. JEFFRESS:  No, I think that's correct, Your Honor,

18   based on -- Between 100 and 300 grams is a 36.  Mr. Viola

19   receives a reduction for three points for acceptance of

20   responsibility, is a first time offender; two points for the

21   safety valve under 2D1.1.  So that results in an adjusted offense

22   level of 31, I believe, and in a criminal history category 1,

23   that's 108 to 130.

24        THE COURT:  All right.  That level, adjusted offense level

25   31 with a criminal history category of 1, the range appears to be

1    108 to 135, I think.

2         MR. JEFFRESS:  35.  I'm sorry.

3         THE COURT:  Ms. Dixon, did you want to supplement this in

4    any way?

5         MS. DIXON:  No, Your Honor.

6         THE COURT:  Mr. Viola, did you understand what your lawyer

7    and I have just said?

8         THE DEFENDANT:  Yes, Your Honor.

9         THE COURT:  All right.  I will not be able to determine

10   the recommended guideline sentence for your case until after the

11   presentence report has been completed and after you and your

12   counsel and the government have had an opportunity to object to

13   any facts or conclusions drawn by the probation officer.  Do you

14   understand that?

15        THE DEFENDANT:  Yes, Your Honor.

16        THE COURT:  Indeed, the report may show, for example, that

17   your criminal record or your role in this offense is greater than

18   it appears now and that your recommended guideline range could

19   expose you to up to the statutory maximum of life in prison, not

20   just the 135 months that you heard about.  Do you understand

21   that?

22        THE DEFENDANT:  Yes, Your Honor.

23        THE COURT:  And the sentence imposed may be much higher

24   than any estimate that your attorney or the government has made

25   so far.  Do you understand that?

1          THE DEFENDANT:  Yes.

2          THE COURT:  Indeed, it could be as high as life in prison.

3     Do you understand that?

4          THE DEFENDANT:  Yes, I do.

5          THE COURT:  After I've decided what guideline range is

6     recommended for your case, I still have the authority to impose a

7     sentence that is more severe or less severe than the sentence

8     called for by the guidelines.  Do you understand that?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  The government may have the right, just like

11     you do, to appeal any sentence that is unlawful if I impose an

12     unlawful sentence.  Do you understand that?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  Now, the government has agreed to consider

15     asking the Court for a more lenient sentence for you in exchange

16     for your cooperation.  Whether they ask for that or not is their

17     decision and only theirs, and neither your lawyer nor I can force

18     them to make such a request.  Do you understand that?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  If the government does make such a request,

21     it's I who will be the one making the decision on whether to

22     grant that request.  Do you understand that?

23          THE DEFENDANT:  Yes.

24          THE COURT:  Parole has been abolished, and if you are

25     sentenced to prison, you will serve the sentence I impose and you

1  will not be released early on parole as used to be the case.  But

2  you may be subject to a possible reduction of your prison term of

3  good time of up to 54 days a year.  Do you understand that?

4       THE DEFENDANT:  Yes, Your Honor.

5       THE COURT:  If you plead guilty and I accept your plea and

6  find you guilty of a felony, then such a finding may deprive you

7  of valuable civil rights, such as the right to vote, the right to

8  hold public office, the right to serve on a jury, the right to

9  possess any kind of firearm, and the right to be free from

10  collection of DNA samples from you.  Do you understand that?

11       THE DEFENDANT:  Yes, I do, Your Honor.

12       THE COURT:  If the proper guideline range is higher than

13  you expected, as I warned you it could be, or the sentence is

14  more severe than you expected, then you will still be bound by

15  your guilty plea and you will not have a right to withdraw it.

16  Do you understand that?

17       THE DEFENDANT:  Yes, I do.

18       THE COURT:  If I do not accept any sentencing

19  recommendation made by the lawyers at sentencing, you will still

20  be bound by the guilty plea and not have a right to withdraw it.

21  Do you understand that?

22       THE DEFENDANT:  Yes.

23       THE COURT:  Has anyone at all promised or suggested to you

24  that I will give you a lighter sentence just because you're

25  pleading guilty?

1        THE DEFENDANT:  No, Your Honor.

2        THE COURT:  Has anyone made any promises to you as to what

3   sentence I will impose in this case if I accept your proposed

4   guilty plea?

5        THE DEFENDANT:  No.

6        THE COURT:  At this time, I do not know what sentence I

7   will impose in your case because I have not yet heard from the

8   lawyers or from the probation office.  Do you understand that?

9        THE DEFENDANT:  Yes, Your Honor.

10        THE COURT:  Now, has anyone made any promises to you in

11   connection with your proposed plea, other than those contained in

12   the plea agreement?

13        THE DEFENDANT:  No one's promised me anything, no.

14        THE COURT:  Is there anything that you do not understand

15   about this proceeding or your proposed plea in this case?

16        THE DEFENDANT:  No, Your Honor.

17        THE COURT:  Is there anything you want to ask me or ask

18   your lawyer before you make a decision about whether you want to

19   plead guilty to the superseding information or go to trial?

20        THE DEFENDANT:  I would say, besides the probation report,

21   is there -- are there other thing that you consider, other

22   factors?

23        THE COURT:  Did you want to confer with your lawyer before

24   you finish your question?

25        THE DEFENDANT:  He's answered my question.

1        THE COURT:  You can feel free to ask me anything you want.

2        THE DEFENDANT:  He answered my question.

3        THE COURT:  He answered your question?

4        THE DEFENDANT:  Yes.

5        THE COURT:  Have you had enough time to consult with him

6   about your question?

7        THE DEFENDANT:  Yes.

8        THE COURT:  All right.  Is there anything else you want to

9   ask me or ask your lawyer before you make a decision?

10        THE DEFENDANT:  No, Your Honor.

11        THE COURT:  Are you ready now to make a decision about

12   whether you want to enter a plea of guilty to the superseding --

13   I'm sorry, to the information or whether you want to go to trial?

14        THE DEFENDANT:  Yes, I am, Your Honor.

15        THE COURT:  How do you plead to the information?

16        THE DEFENDANT:  I would plead guilty.

17        THE COURT:  Are you pleading guilty voluntarily and of

18   your own free will?

19        THE DEFENDANT:  Yes, Your Honor.

20        THE COURT:  Has anyone forced you ore threatened you or

21   coerced you in any way into pleading guilty?

22        THE DEFENDANT:  No, Your Honor.

23        THE COURT:  Are you pleading guilty because you are guilty

24   and for no other reason?

25        THE DEFENDANT:  Yes, Your Honor.

1      THE COURT:  All right.  I'm satisfied that Mr. Viola's

2  fully competent and capable of making a decision today, that he

3  understands the nature and consequences of what he is doing, that

4  he's acting voluntarily and of his own free will, and that there

5  is an adequate factual basis for his plea, and I, therefore,

6  accept the plea.

7      Let me hear from counsel, then, with respect to release

8  conditions and/or setting a sentencing date or not.

9      MS. DIXON:  Your Honor, with regard to release conditions,

10  I believe that the last time we were before the Court counsel,

11  defense counsel made a representation about a change in release

12  conditions and we did not oppose it.  At this time, we see no

13  reason to ask for anything other than what the Court has

14  previously ordered.

15      MR. JEFFRESS:  The Court ordered that change, and that was

16  just to move Mr. Viola, whose never had any positive drug tests,

17  to testing as directed by pre-trial services, instead of weekly,

18  and the Court did order that.  And so his conditions, with the

19  government's permission, we would request they remain the same.

20      THE COURT:  All right.  What I will do then, since this is

21  a new case, 07-86, I will order that the conditions that had been

22  in place in case 05-454-02 be imposed in this case.

23      MR. JEFFRESS:  Your Honor.

24      THE COURT:  Now, given the cooperation provision, I take

25  it we should not order a presentence investigation at this point,

1    or should we?

2          MS. DIXON:  Not at this time, Your Honor.  I would ask the

3    Court not to do so at this time.

4          THE COURT:  All right.  What we'll do, then, is require

5    the parties to file under seal a joint written status report

6    within 90 days reflecting whether or not the case is ready to be

7    presented for a presentence investigation.  If it is ready, you

8    should indicate three mutually alternative agreed upon dates for

9    sentencing 70 days out from then.

10         If it's not ready, then indicate a new date by which you

11   would file an updated joint status report reflecting the same

12   information.

13         So, we'll give you 90 days to file a joint written status

14   report under seal.

15         THE DEPUTY CLERK:  June 28th, Your Honor.

16         THE COURT:  That would be due on June 28th.  And I'll

17   order that all sentencing memoranda shall be filed no later than

18   five business days prior to the sentencing date that's set.  All

19   right.  Ms. Romero.

20         (Discussion had off the record.)

21         THE COURT:  Okay.  Let's have everybody sign it.

22         THE DEPUTY CLERK:  Mr. Viola, do you understand the

23   conditions of your release as have been set by the Court?

24         THE DEFENDANT:  Yes.

25         THE CLERK:  Do you solemnly swear or affirm that you will

1  abide by the conditions of release as have been set by the Court?

2       THE DEFENDANT:  Yes, I do.

3       THE DEPUTY CLERK:  Mr. Viola.

4       THE DEFENDANT:  Yes.

5       THE DEPUTY CLERK:  These are the release conditions set in

6  your case and the general conditions.

7       THE COURT:  All right.  Anything else we need to take up?

8       MR. JEFFRESS:  Your Honor, Mr. Viola brought his special

9  assessment today, so I will make sure that is paid to the Clerk

10  of the Court as soon as the paperwork is completed.

11       THE COURT:  All right.  Very well.

12       MR. JEFFRESS:  Thank you.

13       THE COURT:  Anything else?

14       MR. JEFFRESS:  Nothing further.

15       THE COURT:  All right.  Anything else?  Ms. Dixon.

16       MS. DIXON:  Nothing from the government.  Thank you, Your

17  Honor.

18       THE COURT:  All right.  Thank you.  You may be excused.

19       MS. DIXON:  Your Honor, is there an extra copy on the

20  release conditions.

21       THE COURT:  I think she has yours.

22       (Proceedings adjourned at 4:17 p.m.)

23

24

25

1

2

## <u>C E R T I F I C A T E</u>

3

4              I, Scott L. Wallace, RDR-CRR, certify that
the foregoing is a correct transcript from the record of
5     proceedings in the above-entitled matter.

6

    _____        _____
7      **Scott L. Wallace, RDR, CRR**              **Date**
         **Official Court Reporter**
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25